Filed 1/23/25 P. v. Canoflores CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SANTOS CANOFLORES,<br><br>    Defendant and Appellant. | A168191<br><br>(San Francisco County Super. Ct. No. CRI-22010187) |

Santos Canoflores appeals from a conviction for making criminal threats. He maintains there is insufficient evidence to support the conviction. We affirm.

## BACKGROUND

### I.

### *Factual Background*

Canoflores and Elsa Marcelina Jochola Lopez met in 2018 and developed a romantic relationship. They lived together in Lopez's apartment, though they repeatedly argued and Canoflores would stay elsewhere, then return. Lopez's adult children also lived in the apartment.

1

**A. July 3, 2021**

On July 3, 2021, Lopez and Canoflores were arguing about Canoflores wanting to be paid back for his portion of the rent. Lopez testified[1] that she did not want to give Canoflores the money because he was drunk, and she thought they would "patch things up" the next day. Canoflores called the police. Lopez told the responding officer, Kevin Mooney, that at around 3:00 a.m., Canoflores had picked her up and tied her up, put her in the shower, and removed her pants and stuffed them in her mouth; she was tied up and gagged for three hours. Lopez refused the police officer's offer of shelter.

**B. August 16-17, 2021**

On August 16, 2021, Lopez and Canoflores were mad at each other, and he was living somewhere else. Around dawn, Lopez was in bed and Canoflores came in, hit her on the side of her head with a closed fist and with an open hand, and grabbed her hair "really hard." She testified that she was "a bit hurt," then that it "hurt a lot" when he hit her. There was blood inside her lip. Canoflores took her cell phone and left the apartment. Lopez testified that Canoflores hit her because she had gone out to eat with a male friend and Canoflores "said it was bad to have friends."

Lopez went to the police station later that day because she wanted to get her phone back, having learned from friends that Canoflores had sent personal photographs that were on her phone. She bought another phone but had to use the same phone number, and, on August 17, she received text messages from Canoflores on the new phone, saying "ugly" things.[2] The texts included Canoflores saying " 'I'm going to kill you, dumb ass' " and " 'And I

---

[1] Lopez testified with the assistance of an interpreter.

[2] The texts were in Spanish.

am going to do it' "; saying he was on his way and would be waiting at the door for her; and saying he was going to "get at [her] where it most hurt." Canoflores called repeatedly; Lopez sometimes answered and sometimes did not. He texted telling her to answer, followed by a "bad word"; asked where she was, then texted, " 'You probably went to sleep with your new boyfriend[,]' " " 'Lovers[,]' " "Congratulations[,]" and the name of the friend Lopez had gone out with. Canoflores also texted, " 'I know where you live' " and work, followed by " 'Answer me[,]' " " 'Why don't you answer me[,]' " " 'We'll see each other[,]' " " 'Enjoy your kid[,]' " " 'I am going to show you how to do things[,]' " " 'I told you to never lie to me[,]' " and " 'Nor cheat on me.' " After repeatedly asking why she was not answering him, Canoflores texted that he was not going to bother her, told her to take care of herself, and said he loved her and she was the best thing in his life.

Around 4:00 p.m. on August 17, Lopez's daughter called to say Canoflores was outside the house. Lopez tried to get home quickly because her daughter was home alone, but Canoflores was not there when she arrived. Lopez explained that she was concerned about her daughter being alone because she thought Canoflores might be drunk, "when he is drunk, he doesn't know what he is doing" and "everything that has happened has been when he is drunk." When asked if she was afraid for her daughter's safety, however, Lopez responded that Canoflores never did anything to her children, just to her.

Lopez testified that after receiving the text messages from Canoflores, she felt "scared" that he was going to come into her house drunk. The text saying he was going to hurt her where it would hurt the most caused her to be concerned for her own safety, as did the text saying he was going to kill her.

3

At about 5:39 p.m. on August 17, Lopez spoke with the police and showed them the text messages. Lopez testified that she was not crying but was "really scared," "nervous, like shaking" and "frightened." She refused the officers' offer of shelter because her children would not have been able to go with her and she did not want to leave them by themselves.

Lopez and Canoflores broke up after this incident but got back together and he moved back into the apartment.

**C. September 5, 2022**

On September 5, 2022, Lopez was watching soap operas in her room when Canoflores got home drunk. He wanted dinner and when she told him to wait, he took a remote control and threw it out the window. She got up, and Canoflores, holding a kitchen knife in his hand, would not let her out of her room. He was two to three feet away from her. She was afraid because he was drunk, and she did not know if he could hurt her. She called the police. Lopez testified that when she went outside, Canoflores put the knife back in the kitchen and followed her. She acknowledged having told the police that her children put the knife away and having testified at the preliminary hearing that Canoflores followed her into the kitchen to grab the knife.

One of the police officers who responded to Lopez's apartment, Lizeth Lopez-Martinez, testified that Lopez's lip was red and swollen. The officer did not notice this injury at first and did not observe any bleeding; Lopez was calm and did not request medical treatment or shelter. She told the officer that there were no witnesses to the incident. Canoflores was arrested. The police found a broken remote control in the middle of the street and, inside the apartment, saw an approximately five-inch serrated knife on the kitchen counter. Officer Alex Pinnel testified that Canoflores said he and Lopez had

4

argued about his drinking, that he had consumed five beers and that he was being aggressive toward Lopez but there was no physical altercation, and he did not threaten her.

### D. Defense

#### 1. July 3, 2021

Police officer Mooney responded to Lopez's apartment on July 3, 2021. He testified that when he arrived, Canoflores said his girlfriend was trying to kick him out but refusing to refund his rent. Canoflores had been drinking. Mooney noticed small fresh scratches on the side of Canoflores's neck; he saw no injuries on Lopez, and she did not request medical attention. Lopez told Mooney that Canoflores had come home drunk and was angry that she would not get up to drink with him; they argued and he picked her up, carried her into the bathroom against her will as she resisted, tied her hands behind her back, took off her pajamas and shoved them in her mouth, and told her not to leave until he returned. There were other people in the unit, but no one witnessed the incident. In the bedroom connected to the bathroom, Mooney found an electrical cord that was identified as what was used to tie Lopez. Mooney testified that Lopez's demeanor was "pretty calm" and not "really indicative of someone who went through such a trauma," but noted that he could not testify to someone else's state of mind or reaction to a situation. Lopez had gotten out of the bathroom about four hours before Mooney arrived. Mooney believed that what Lopez described had happened and arrested Canoflores. Lopez was given an emergency protective order.

#### 2. 2018 Altercation

In 2018, Jennifer Avalos went to the police station to file a complaint against Lopez, saying Lopez had attacked her by grabbing her hair and biting her arm, and had poked Avalos's four-year-old son in the eye while picking

him up by the armpits. Avalos shared an audio recording in which a child could be heard crying, but there was no video depicting the incident. The incident had occurred the night before and Avalos had told the responding officers that she did not want to press charges. An emergency protective order was issued for Avalos's two children. Lopez was not arrested. Hilario Chulin, whose house Lopez and Avalos lived in at the time, testified that he saw a video taken by Avalos's older son that showed Lopez pulling Avalos's hair and scratching her face.

### 3. Canoflores's Testimony

Canoflores testified[3] that Lopez was sometimes loving toward him and sometimes mistreated him, including dating other men. They both drank alcohol; when drinking, Lopez would behave "rudely," as if she did not care what she did or said, and sometimes she was violent. Canoflores acknowledged that it bothered him that Lopez had other friends she went out with, as he saw photographs of these friends hugging or kissing her "in a way that went beyond just friends." He would tell Lopez they should end their relationship, but she would say "it's nothing" and he should come back to her. He was kicked out of Lopez's apartment three or four times, sometimes because he wanted to end the relationship and other times because she would tell her children he was scolding or mistreating her, and they would tell him to leave. He would return because Lopez convinced him to.

On July 3, 2021, friends were at the apartment drinking when Canoflores got home from work. Lopez wanted him to join them and got upset when Canoflores said he was tired and wanted to rest. Canoflores fell asleep in the bedroom, then Lopez's son came in looking for Lopez and saw her asleep in the bathtub. Lopez's son woke her up and they went to the

---

[3] Canoflores testified with the assistance of an interpreter.

6

kitchen.  Later, Lopez returned to the bedroom with her son and two friends. She told Canoflores to leave because she did not want him living there anymore.  He had already paid his rent and asked for his money back.  He tried to get his belongings, but they would not let him.  Lopez tried to "pull" him to stop him, touching him on his chest and neck.  He said he was going to call the police to help him, and she said she was going to call and he would be arrested.  When the police arrived, Canoflores asked for help getting his belongings and his money.  He did not tell the police the other things that had happened because he loved Lopez and did not want her to have problems with the police.

On the night of August 15, 2021, Lopez texted Canoflores, saying she was going to go out with a man and asking for money.  She sent photographs and a video of where she was to make him jealous.  Canoflores felt disappointed and upset.  During the early hours of August 16, he was at his friend's apartment, where he would stay when Lopez kicked him out; he did not go to Lopez's apartment.  On August 17, he and Lopez were texting each other.  Some of his texts to her were "bad" and others "good."  Not all of the texts were true; he wanted to end the relationship and was trying to upset Lopez so she would not want to be with him either.

Lopez later apologized and Canoflores returned to her apartment because he loved her.  On September 5, 2022, he had five beers on his way home from work.  When he got home, Lopez was watching television in the bedroom.  There were beer bottles around and Canoflores asked if she was drinking alone.  She got upset and started to "push" and "attack" him.  He tried to cover his face because "when she gets like, that she scratches my face."  He went to make dinner and she told him she was going to call the police if he did not start paying attention to her.  When the police arrived,

7

Lopez went downstairs and he went down to find out what she was telling them. The police arrested him without telling him what Lopez had said. He told the police they had been arguing but did not remember saying anything else. He denied telling the police that he had been aggressive with Lopez and testified that she was the one being aggressive.

Asked if he knew Lopez would be scared by his text saying he was going to kill her, Canoflores testified, "Yes, but it wasn't true." The text saying he was on his way to her home and would see her at the door was not true either. The texts saying he knew where she lived and worked were not meant to frighten her but to "get some distance" so she would not call him again. The text telling Lopez to "[e]njoy your kid" was "a bad translation": He wrote, "[e]njoy your boy," referring to the person she had gone out with, who she had said was younger than Canoflores.

## II.

### *Procedural Background*

Canoflores was charged by information filed on December 22, 2022, with five offenses: domestic violence (Pen. Code,[4] § 273.5, subd. (a)) (count 1, August 16, 2021); assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)) (count 2, August 16, 2021); criminal threats (§ 422) (count 3, August 16–August 17, 2021); misdemeanor battery (§ 243, subd. (e)(1)) (count 4, September 5, 2022); and misdemeanor exhibiting a deadly weapon (§ 417, subd. (a)(1)) (count 5, September 5, 2022). Canoflores filed a motion to set aside counts 1 to 3 (§ 995), which the trial court denied.

On April 26, 2023, after the prosecution closed its case at trial, Canoflores moved for acquittal on all counts. (§ 1118.1.) The court granted

---

[4] Further statutory references will be to the Penal Code.

8

the motion as to counts 2 and 4, and trial continued on the remaining counts. The jury found Canoflores guilty of making criminal threats (count 3) and not guilty of domestic violence and the lesser included offense of battery of a cohabitant (count 1) and exhibiting a deadly weapon (count 5).

On June 14, 2023, the court suspended imposition of sentence and placed Canoflores on probation for three years.[5]  Canoflores was ordered to serve 101 days in county jail with 101 days of credit for time served.

Canoflores filed a timely notice of appeal on June 16, 2023.

## DISCUSSION

Canoflores argues the evidence was insufficient to support his conviction for making criminal threats.  Specifically, he contends there was insufficient evidence that his texts caused Lopez to be in "sustained fear for her own safety."

Section 422, subdivision (a) provides:  "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or

---

[5]  The defense asked the court to reduce the conviction on count 3 to a misdemeanor pursuant to section 17, subdivision (b).  The court denied this request but stated that the motion should be reconsidered if Canoflores had no probation violations and, "if there [are] no violations, no violations to the stay-away order, no new arrests, because I know he has no record, then the Court will most likely [section] 17[, subdivision] (b) it at that time."

her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

The jury was instructed on each of the elements of this offense pursuant to CALCRIM No. 1300. The only element Canoflores directly challenges as unsupported by the evidence is that the threats actually caused Lopez to be in "sustained fear" for her own safety. Consistent with caselaw (*People v. Roles* (2020) 44 Cal.App.5th 935, 942; *People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*), the jury was instructed that "[s]ustained fear means fear for a period of time that is more than momentary, fleeting, or transitory."

" ' "To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt." ' [Citation.]" (*People v. Thomas* (2023) 14 Cal.5th 327, 377-378 (*Thomas*).) "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 515.) " 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' [Citation.] ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' [Citation.] 'A reviewing court neither reweighs the evidence nor reevaluates a witness's credibility.' [Citation.] Reversal is not

10

warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]" ' [Citation.]" (*Thomas,* at pp. 377-378.)

The criminal threats conviction was based on the texts Lopez received from Canoflores. As described above, several of the texts made express or implied threats, including Canoflores saying he was going to kill Lopez, he was on his way and would be waiting for her at the door, he was going to get at her where it hurt most, and he knew where she lived and worked. Lopez testified that the text messages caused her to feel "scared" and concerned for her own safety, and that when she showed the texts to the police, she was "really scared," "nervous, like shaking" and "frightened." She was also concerned about her daughter being home alone with Canoflores outside the apartment.

A victim's testimony that she was frightened can be sufficient to support a finding of sustained fear. (E.g., *People v. Brugman* (2021) 62 Cal.App.5th 608, 617, 634 (*Brugman*) [victim testified she was " 'scared' " and " 'froze' "][6]; *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1348 [victim feared for his life during brief encounter and for up to 15 minutes thereafter]; *People v. Lipsett* (2014) 223 Cal.App.4th 1060, 1064, fn. 2.) Indeed, *Lipsett* held that the victim's testimony that he was " 'worried' " when the defendant made the threat was sufficient to support the jury's determination that the victim was in sustained fear. (*Id.* at p. 1064, fn. 2.)[7] In evaluating whether

---

[6] The defendant in *Brugman* had subjected the victim, his girlfriend, to violent conduct and threats prior to the incident underlying the criminal threat conviction. (*Brugman, supra,* 62 Cal.App.5th at pp. 615-617.)

[7] In *Lipsett,* while the defendant was in the process of stealing a bicycle, the owner confronted him, the defendant yelled to shoot the owner's

11

the evidence establishes a criminal threat, " 'the communication and the surrounding circumstances are to be considered together.' " (*In re A.G.* (2020) 58 Cal.App.5th 647, 654.)

Canoflores argues that Lopez's behavior in response to the texts belied her claim that she was scared or concerned and showed she knew he was not expressing a serious intention to harm her. He points out that Lopez did not immediately call the police to report the threats and went to the police only for help getting her phone back; that she declined offers of shelter despite Canoflores having access to the apartment; that she responded to her daughter's call by rushing home, where she expected to find Canoflores; and that she resumed her relationship with Canoflores despite the texts, consistent with their previous pattern of fights and reconciliations. In Canoflores's view, no person in sustained fear of being killed or seriously injured would act as Lopez did.

Lopez's failure to act as Canoflores would expect of a truly scared person did not preclude the jury from finding she experienced sustained fear. For example, *Brugman, supra,* 62 Cal.App.5th 608, 634, rejected the argument that the evidence did not support a finding of sustained fear because the victim continued living with the defendant rather than leaving immediately or soon after he put a gun to her head and threatened to kill her. As *Brugman* explained, "a victim can experience sustained fear even if the fear exists only during the incident itself, as long as the fear during the incident is more than 'momentary, fleeting, or transitory.' " (*Ibid.,* quoting *Allen, supra,* 33 Cal.App.4th at p. 1156.)

---

dog and his accomplice approached the owner with what appeared to be a revolver. (*Lipsett, supra,* 223 Cal.App.4th at pp. 1062-1063.)

Here, all of the conduct Canoflores sees as negating Lopez's claimed fear was addressed in defense counsel's closing argument, which centered on portraying Lopez as "inconsistent, an embellisher and a liar." The jury nevertheless believed Lopez's testimony about the effect Canoflores's threat had on her. Canoflores asks us to reject the jury's determination, but an appellate court cannot reweigh evidence or reevaluate a witness's credibility. (*Thomas, supra,* 14 Cal.5th at p. 378.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Canoflores suggests that his conviction should be deemed unsupported because he does not have a violent history, reasoning that this conclusion is the converse of cases' recognition that a victim's knowledge of the defendant's prior violent conduct "is relevant in establishing that the victim was in a state of sustained fear." (*Allen, supra,* 33 Cal.App.4th at p. 1156 [death threat to ex-girlfriend's mother, who had previously called police about defendant and was aware he had been looking inside her home; defendant had been violent toward ex-girlfriend]; *People v. Fierro, supra,* 180 Cal.App.4th at p. 1348 [recent verbal confrontation contributed to victim's fear when defendant returned, showed what appeared to be a gun and threatened to kill victim]; *People v. Garrett* (1994) 30 Cal.App.4th 962, 967 [wife's knowledge that defendant had killed a man with a gun in the past, as well as his prior violence toward wife, relevant and probative on

13

issue of sustained fear].)[8] Canoflores argues that the court's dismissal of the count of assault with force likely to cause great bodily injury shows he did not seriously hurt Lopez on August 16; there is no evidence he ever seriously hurt her; and the not guilty verdict on count 5 shows the jury was not convinced his holding a knife on September 5, 2022, amounted to exhibiting a deadly weapon.

Canoflores's argument makes little sense as an abstract proposition: While it is obvious that a victim may be more frightened by a threat if she is aware the defendant has been violent in the past, there is no reason a defendant with no violent history *cannot* make a threat that satisfies the elements of a criminal threat. More to the point, there *was* evidence Canoflores had been aggressive and violent toward Lopez prior to the text messages he sent on August 16 and 17. Lopez testified that in the early morning of August 16, Canoflores grabbed her hair "really hard" and hit her in the head with a closed fist and with an open hand, and that on July 3 he carried her to the bathroom, tied her up and gagged her. Even without actual infliction of serious physical injury, Canoflores's aggression and violence were part of the surrounding circumstances to be considered in evaluating whether Lopez experienced sustained fear as a result of the texts. (*In re A.G., supra,* 58 Cal.App.5th at p. 654.)

Lopez's testimony that Canoflores's texts caused her to feel "scared" and concerned for her own safety, and that she was "really scared," "nervous, like shaking" and "frightened" when she showed the texts to the police, was

---

[8] Similarly, although directed at a different element of the offense, the court in *Brugman, supra,* 62 Cal.App.5th at page 633, held that in light of defendant's prior violence toward victim, it was reasonable for a fact finder to conclude that a death threat at gunpoint was intended as a threat of actual physical harm, not just an angry outburst during an argument.

14

sufficient for the jury to conclude she experienced sustained fear—fear that was "more than 'momentary, fleeting, or transitory.' " (*Brugman, supra,* 62 Cal.App.5th at p. 634, quoting *Allen, supra,* 33 Cal.App.4th at p. 1156.)

## DISPOSITION

The judgment is affirmed.

                                        _____
                                        STEWART, P. J.


We concur.


_____
RICHMAN, J.


_____
MILLER, J.


*People v. Canoflores* (A168191)